please all rise. Here ye, here ye. This Honorable Appellate Court for the Second Judicial District is now open. The Honorable Christopher M. Desai. Good morning, everyone. Please be seated. Your Honor, we're going to the case of the Dr. James Marozau. Statute 24-0753. Mr. Stone, you may begin when ready. Please feel free to adjust the microphone. Good morning, and may it please the Court. Good morning. My name is Judge Stone. I represent the appellant, Vladimir Marozau. A delusion is a fixed, false belief. That sleeper cells of Muslim terrorists were in Highland Park, Illinois is a fixed, false belief. Even before the home invasion event, Mr. Marozau was in the Highland Park Police Department telling them about this fixed, false belief. About the victims' terrorist plots in Highland Park. About Nivania Levitas, the victim in this home invasion, being a Muslim terrorist. A fixed, false belief. Three doctors, Dr. Anast, Dr. Hamlin, Dr. Latham, all psychologists. All of them stated in one word or another that this was a delusional disorder with persecutory type features. That was Dr. Anast. Dr. Hamlin was a little more circumspect. He was the psychologist hired by the state. He said that there were red flags, his words, concerning Marozau's mental health. And the court appointed Dr. Latham, who said, quote, I concur with the provisional diagnosis offered by Dr. Anast. That this was a delusional disorder, persecutory type. All three of them came to a similar conclusion. A fixed, false belief of sleeper cells in Highland Park. Mr. Stone, may I ask a question? I apologize for interrupting. No, please. The defendant here knew the husband of this woman? We have a couple of Dimitris who are in this fact pattern. It's only in the Russian novel. It is. And I thought I had the last name correct. But he isn't the victim here, the wife or soon to be ex-wife of his friend Dimitri? That's correct. And they've known each other for, well, Dimitri and the defendant have known each other about 13 years. Right. Has this ever come up before in the relationship between Dimitri and the defendant? All I know is that a week or so before this incident, Mr. Marzo was in the Highland Park police station telling them that he had discovered this sleeper cell, this plot of Islamic terrorists, and that they should do something about it. That's clearly a fixed, false belief. It's clearly what each of the doctors noted in their individual reports. I'm reminded of a lyric from a Bob Dylan song. You don't have to be a weatherman to know which way the wind blows. This is a man with serious mental illness. But my question was, did husband Dimitri, and I'll call him that only because we have multiple Dimitris, ever talk to the defendant about his wife, or soon-to-be ex-wife, that we're aware of from this record? From this record, there is nothing that answers that question. Either way, it was not anyone's position that there wasn't a concern of the sleeper cell in the mind of Mr. Marzo for months. We only know that before this crime was committed, he, Marzo, was in the Highland Park police station complaining about a fixed, false belief for him, something he believed, according to Dr. Honest, a red flag according to Dr. Hanlon, and a fixed, false belief according to Dr. Latham. And we know that because we have police reports that verify that. They're part of the common law record. But Hanlon and Honest and Latham all agreed that there was some kind of red flag or delusional disorder. And Marzo had gone to the police station before. The lawyers who were representing Mr. Marzo had a strong, affirmative duty to investigate these claims by Marzo and to come to understand or rule out a defense either of insanity or fitness or both. There is a case out of the Seventh Circuit Court of Appeals, Brown v. Stearns, Brown, P-R-W-N, Stearns, T-E-S-T-E-R-N-E-S. The Seventh Circuit instructs, quote, attorneys have a professional obligation to conduct reasonable investigations or to make reasonable decisions that make particular investigations unnecessary. That's our duty as defense lawyers. And it's a duty that's essential for due process and for effective assistance of counsel. The court went on to say the duty to investigate derives from counsel's basic function, which is to make the adversarial testing process work in a particular case. They abnegated that responsibility. So what did counsel say about that, particularly insanity defense? Mr. Zeit was called to testify about this. And what was his testimony on that point? He said we heard the information about a fixed false belief. We didn't believe that he was insane. And we didn't believe that there was a fitness issue. Well, that ain't good enough. They had a duty to investigate it. And although I just quoted Dillon saying you don't have to be a weatherman to know which way the wind blows, the lawyer's duty is to investigate all possible defenses and either include them or rule them out. Well, didn't that particular lawyer say that in the end, after conversations, there were three lawyers and your client. We decided to test the sufficiency of the State's case. We can talk about that if you'd like. The sufficiency of the State's case was a key was given to the House by Dr. Levitas to Marzo. That was his defense. Guess what? That was a false defense, and we know that from the record. A key was made but not given to him by Levitas, and Levitas testified that that's not what happened. So the defense that the defense lawyers advanced, I won't say fabricated, but advanced, had no legs to it. And the judge saw through that defense, and correctly so. Well, counsel, do we judge a defense based on whether or not it was successful? No. Then why was not this defense a reasonable approach to this case, given all of the circumstances? Because it wasn't true, and because it wasn't, it ignored what was in front of all three of those lawyers. Which would be specifically what? A delusional. With respect to the defense they did take, why was it unreasonable? Because Levitas, the best witness for this, said, I didn't give him a key. And if the defense was, he gave me a key, and the witness is going to say, I didn't give him a key, that's pretty much a failed defense. It wasn't part of it that he was saving his own bacon, right? That Dimitri was denying the issuance of the key because he didn't want to be implicated in the whole thing, right? As part of the defense strategy. I mean, I suppose we could, without evidence, we could come up with excuses for Dr. Levitas' testimony. But that too should have been thought out, parsed out, and included in the advance of a defense. The fact that there was this insanity, that is, that there was a disease or defect of the mind, such that the individual lacked the capacity to appreciate the criminality of his conduct, was right in front of them. It was right there. They chose not to, they can choose not to use it, but they can't choose not to use it without investigating it. And that, of course, is what the Seventh Circuit tells us. Was it part of it also to investigate the other facts in the case? Of course, you have to do all. All of the facts in the case would seem to bode against going forward with an insanity defense. I respectfully disagree. Okay, fair enough. When faced with a person with serious mental illness. Mental illness does not equate to insanity. Pardon me? Mental illness does not equate to insanity. No, that's why I'm saying to you that there has to be some disease or defect of the mind, such that that person lacks substantial capacity to appreciate the criminality of his conduct. That is what insanity is. I appreciate that, but my point is, and what I'd like you to get to, is that, you know, the trial court heard all the facts and found that this was a very premeditated act, not bringing a cell phone, not using his own car, asking his cohort to park the car where it wouldn't be visible. I mean, that speaks volumes to suggest that an insanity defense would never have held water. Again, I respectfully disagree. Okay. The insane don't need to be stupid or not cunning. That's not the issue. The issue is, did he believe that there was a sleeper cell, that that sleeper cell was about to make a Muslim terrorist attack on the nation, and for that reason, because of his fixed false belief, did he lack capacity to appreciate the criminality of his conduct? That is to say, Mr. Marazzo believed, as if it were the truth, that he had to stop this sleeper cell terrorist attack. That was a false belief. It was a fixed false belief, but it was why he could not appreciate the criminality of his conduct. And so his, your basic premise then is his belief led him to the action to undertake the takedown of this cell by himself without any help. That's correct, except he went to the police seeking help. But he wasn't getting any. He wasn't getting any. At least in his mind. Yeah. Isn't it interesting that a week before he went to the police and told them about this sleeper cell? It's interesting, but maybe it was part of the plan, as Justice Ferguson was just talking to you about, to use a different car, to park far away, to not use a cell phone or have one to be pinging off cell towers. It could have been part of that whole enterprise, so to speak. And that certainly was Judge Strickland, the trial judge's position. Respectfully, he was wrong to do that. And the lawyers were defective under the Sixth Amendment in not putting together or at least investigating a case of mental illness, a case of insanity, a case of fitness. Okay. So let's get to your, I think it's your second point, the retrospective motion. Yes. And what was the, I mean, what were you seeking in that? Were you seeking to have a finding of unfitness to participate in the trial or actual insanity? Go ahead. Some of these go together hand in hand. The case of People v. Brown, which is a decision out of this court, which is cited in our brief, teaches us an important lesson. Permitting a defendant to raise an issue after he's been convicted is consistent with the principle that the conviction of a person who is, in fact, unfit to stand trial violates due process. That's what we have in this case. Mr. Morrison went to trial. His lawyers didn't present any evidence of fitness or insanity. He was convicted. Afterwards, we presented evidence that he was unfit. The judge ultimately, after a great deal of litigation, found him unfit. We found him unfit for sentencing substantially after the time the trial occurred. Absolutely. And that's what a retrospective fitness hearing is. It's after the trial because, I think my time is up, but I'll conclude with this. There were facts, there were words, there were police reports, all of which advanced the claim that Mr. Morrison had a mental illness and lacked substantial capacity to appreciate the criminality of his conduct. And in the words of the FBI agent, he was bat-ass crazy. Thank you. All right. Thank you, counsel. You will have time on rebuttal. Mr. Kelleher, you may begin when ready. Good morning, Your Honors. Counsel, Myles Kelleher on behalf of the people. May it please the Court. I'm not going to dispute that defendant's conduct was bizarre, and I'm not going to dispute that defendant had mental health problems, but I am going to dispute defense counsel's suggestion that defendant may have been insane at the time of the offense, and I am going to dispute defendant's suggestion that there may have been a bonafide doubt as to defendant's fitness at the time of trial. Under the circumstances of this case, trial counsel's decision not to present an insanity defense did not constitute ineffective assistance of counsel. It's very difficult to establish legal insanity. The defense must show that defendant had a mental disease or mental defect and that the defendant lacked the substantial capacity to appreciate the criminality of his conduct. All people are presumed to be sane, and a defendant can have a mental illness but not be legally insane. Counsel, among the three experts, is there any real dispute that he had a mental disease or mental defect? No, Your Honor. Their testimony varied a little bit as to exactly what he was suffering from. Dr. Hanlon found that he had other specified personality disorder with some narcissistic, turbulent, compulsion, histrionic, and paranoid features. So there is general agreement that he suffered from some mental issues. However, Dr. Hanlon, this was an expert in psychology, clinical neuropsychology, who conducted a forensic psychological evaluation of defendant, opined that although the defendant manifested personality disorders, he was not legally insane. And he stated that it was my opinion that defendant did not lack a substantial capacity to appreciate the criminality of his conduct as a result of a mental disease or mental defect. And what was the basis for that opinion? Well, the basis was that Dr. Hanlon mentioned that defendant even questioned whether it was legal or not what he was doing, and at one point he said, I thought I had permission, and Dr. Hanlon said that kind of explanation doesn't even come close to meeting the legal criteria for insanity. And we have to look at the facts of this case, as Justice Jorgensen mentioned, and Dr. Hanlon was aware of the facts, as were defendant's three trial counsels. And the facts were that, you know, after the offense, Detective Saldano interviewed defendant, and defendant stated that he had recruited his buddy Veronin to drive him to Mariana's house, and they used someone else's car, and that's because defendant didn't want to use his own car. And he told, defendant told Veronin to park the car down the road so the neighbors don't see him, and defendant stated that he hid his cell phone so it couldn't be trapped. He took the driver's phone. And defendant had a plan, he was going to go around the back of the house and apparently get up on the grill to enter the balcony, but the grill wasn't there when he went back there, so he had to revise his plan. So then he hid his backpack in the neighbor's yard before he went around the front. So the trial court rejected the notion that defendant was unable to appreciate the wrongfulness of his behavior, because the trial court recognized that this was a premeditated act. Defendant took steps to avoid detection. First of all, he chose to do it early in the morning when few people would be up and the victim would likely be sleeping. He didn't use his own car, which could have been used to identify him. He got a third party, Veronin, to drive the car and instructed Veronin to park the car in an area where it would be less likely that he would be seen. He didn't bring his cell phone because he knew he could be tracked if he brought his own cell phone. And he attempted to go through the back door. So everything about the entry into the home was to avoid detection. His explanation was that he was evading not the police but the terrorist organization, the unspecified organization. And so what are we to make of that? Well, the trial court did not have to accept everything defendant stated. It was clear that he was trying to recognize that he could potentially get in trouble if he was detected. That's why he didn't bring his phone. He didn't go to the front of the house. He had Veronin park the car down the street. And again, if there's any doubt, it was resolved by Dr. Robert Harlan's testimony that the defendant was not insane. And the trial court found Dr. Harlan to be extremely credible, eminently qualified, far more qualified than Dr. Anast. And it was up to the trial court to make that determination. But we also, you know, we also have to look at the trial counsels. They had attorney Douglas Z. testified that he and the other trial counsels, there were three of them, never believed that insanity was viable defense. So, you know, they had ample time to talk to defendant and talk about the offense. And he testified, we never had an issue with regards to insanity. It didn't strike them that he was insane. And they did discuss it at one point. He said that we, you know, we talked about it. We batted it around. But we never thought that insanity was a real-life issue under circumstances. And, you know, that's exactly what attorneys should do. They should, you know, consider different potential defenses. Did they have any duty or responsibility to hire a psychologist or psychiatrist to evaluate him? Not under this. There could be some cases where that might be the case, but not under this case. And the case law holds that where circumstances known to counsel at the time of investigation do not reveal a sound basis for further inquiry, it's not ineffective to forego additional investigation. And a reasonable decision not to investigate an insanity defense is trial strategy. And there's cases that hold that the decision not to investigate an insanity defense is a strategic decision. And it's not ineffective assistance of counsel to abandon a weak insanity defense. What feelings or testimony was revealed about their concern about his ability to assist in the trial? In other words, his fitness to participate in his own defense? Your Honor, there is ample evidence that at the time of trial, no one had a bona fide doubt as to his fitness. And in order to show that someone's unfit, you know, the defense would have to show that he was, because of a mental or physical condition, he was unable to understand the nature and purpose of the proceedings or assist in his defense. And again, a defendant can be fit for trial, although his mind may be otherwise unsound. And here, there's ample evidence that defendants' mental health had deteriorated over the years after trial. This trial occurred in the spring of 2019. And then after trial, during the years of 2020 and 21, defendants' mental health declined. And Dr. Lathan testified about that. Was he in custody the entire time? It's a little unclear, but it sounds like he might have been. I don't know exactly when he was in custody, but it is, I believe, after he was convicted, he was. Right. Yes. But what is clear from the record is that after his trial, his mental health did decline. But for our purposes, the question is, was there a modified question of fitness at the time of trial? And there's ample evidence here. First of all, we had a trial court who had ample opportunity to observe and interact with defendant during the lengthy pretrial proceedings. The court stated that he did not believe that there was a fitness issue whatsoever at the time of trial. The court said that it found no new evidence that there may have been a bona fide doubt of defendant's fitness at the time of trial. At no point did I ever see any sign, even a slight sign, that he was unable to understand the proceedings or that he was unable to cooperate with counsel. And then you have trial counsel Douglas Z. He testified that he did not believe that there was a fitness issue whatsoever at the time of trial. He said that the trial counsels considered defendant's mental health, but they never had a bona fide doubt as to his fitness to stand trial. And then we have attorney Jed Stone, who came on to the case later. He testified that he was contacted by the FBI in September of 2021, but he testified that up until that point, he did not even think there was a basis to ask for a fitness evaluation. And when he did ask for a fitness evaluation, he only asked for a fitness evaluation for sentencing, not for at the time of trial. And yet, I would just add, he had ample opportunities to do that. So this issue is forfeited because it wasn't until September of 23 that defendant raised a fitness issue for trial for the first time. That was more than four years after the trial, and there had been several motions made before that when the question of defendant's fitness at the time of trial never was raised. Counsel, back to the insanity defense. I want to drill down on the substantial capacity to appreciate the criminality of one's conduct. In this case, it appears the defendant was under a delusion that he was justified in his actions. In other words, he felt he had a responsibility to stop this terrorist cell. To what extent does that perspective affect the ability to appreciate criminality? In other words, he's perhaps legitimately under the belief that he has justification. How should we analyze that in regards to the ability to appreciate criminality? Well, you have to separate defendant's belief, which is apparently incorrect, from whether or not he could appreciate the criminality of his conduct. And the fact that he was taking steps to avoid detection, not bringing his cell phone, having a car parked away from the house, going around the back, was all indicative that this was a premeditated attack. He wanted to avoid detection. The point I think Justice Kennedy is trying to make is all of that was because this was a terrorist organization, not because he was trying to get around a law or not conformist conduct. But I'm up against a terrorist. I have to be a little surreptitious. And according to him, the purpose was to bring everybody to the police. If there's any questions, I think that's where we have to defer to the expert, Dr. Robert Hanlon, because he was an expert in psychology, clinical neuropsychology, and he was asked to consider this issue, whether this very bizarre behavior from this person who certainly did have some mental health issues, whether or not his conduct amounted to the criteria for legal insanity, which is very difficult to prove. And his opinion, based on all the circumstances, was that it didn't even come close, because I would just add one more thing. If I could, with my time being expired. Defendant did tell Detective Saldano that he claimed that he wanted to follow the law and did not want to do anything illegal. So that's further evidence that defendant, even though his beliefs about Mariano, may have been delusional and incorrect, he still was attempting to he understood the potential criminality of his conduct and was trying to conform with the law. This wasn't a case where he wasn't unable to do that, and that's confirmed by Dr. Hanlon's testimony and opinion. Mr. Kelleher, I have a question. Looking at Judge Strickland's final order or final reasoning for the order on the retrospective hearing, did he ever really mention insanity during the course of trial, or did he focus on fitness to participate in the stand trial? I mean, Mr. Stone seems to think that the due process umbrella covers both. But what did the trial judge and the evidence really point to? Was it fitness or insanity? Because they are different. This is with respect to the... The motion for retrospective. Well, the motion for the retrospective fitness hearing dealt only with the question of whether there was a bona fide doubt of fitness at the time of trial. So where did that motion come from? That motion wasn't... The insanity came from defendants' first claim that trial counsels were allegedly ineffective for not investigating that defense. So there's two different analysis here. The insanity falls under the ineffective assistance of counsel claim, which I submit was refuted by the record, the facts of this case, and Dr. Hanlon's testimony. And then the fitness issue fell under the question of whether there should have been a retrospective fitness hearing. And again, I submit that that's refuted by the record because five people didn't believe he was fit. Three of his defense attorneys, the trial judge, and even Attorney Stone, up until approximately four years later, didn't believe there was a fitness issue at the time of trial to raise. All right, thank you very much, counsel. Thank you. Mr. Stone, you may proceed when ready. Rollo May, the Harvard psychiatrist in his seminal book, The Divided Self, came out in the mid-60s. I was an undergraduate and read it, and it changed my view of mental illness. These kinds of fixed false beliefs are narrow, they are focused, and they are real. It's not our function, your function or mine today, to say that these fixed false beliefs are real. It's not our function, your function or mine today, to say that these fixed false beliefs rendered him unfit or that these false beliefs rendered him lacking substantial capacity to appreciate the criminality of his conduct. Those are important questions, but they're not the questions for today. The questions for today were defined by the Seventh Circuit in the Brown case, again cited in our brief, where the record establishes that counsel had a reason to know, from an objective standpoint, that a possible defense such as insanity was available. The failure to investigate fully can constitute ineffective assistance of counsel. That's a quote from the Seventh Circuit. That's exactly why we're here today. We're not here today to say that I or any lawyer proved an insanity defense. We're not here today to say that I or anybody proved that at trial he was unfit. What we are here for is because these lawyers saw it, they heard it, they read about it. The Strickland Standard also requires reasonable probability that but for the errors of counsel, the proceeding would have been different. So what do we have to go on that the proceeding would have been different here? Because if a court jury or bench heard evidence that this fixed false belief propelled Mr. Marazzo into an action that was criminal, but he did not appreciate the criminality of it, that would have changed the outcome of this trial. If the jury did not... How do you conclude that in light of all the evidence that would suggest he was not insane? There was no evidence to present that he was not insane. The effort interviewing, an investigation fully and fairly done by the defense lawyers, would have provided that that court, the trial court, with evidence of insanity, that he lacked substantial capacity to conform his conduct, to appreciate that his conduct was criminal. And for those reasons, this court should reverse and revamp to the trial court. So the same question I had asked of opposing counsel I would ask of you, is the defendant's feeling that he was justified in acting the way he did, does that mean that if a defendant feels justified on the basis of a mental disorder, does that meet automatically the lack of substantial capacity to appreciate criminality? These are fact questions, they're fact specific. I don't think there's anything... I've tried many insanity cases in one appeal. I don't know that there's anything that's automatically found, but I will say that with a full and fair investigation by trial lawyers, the rights of the defendant are protected and his right to a fair trial is insured. But without that, he has no fair trial and he has no effective assistance of counsel. For those reasons and for the reasons set forth in our brief, we're asking you to reverse and revamp. Thank you very much counsel, I want to thank both the attorneys for an interesting argument. And we will adjourn and consider the case. We will issue a disposition in due course.